IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PELLA CORPORATION, PELLA WINDOWS AND DOORS, INC., and PELLA WINDOWS AND DOORS OF ONTARIO CORP., <br><br>     Plaintiffs, <br><br> vs. <br><br> LIBERTY MUTUAL INSURANCE COMPANY, <br><br>     Defendant. <br><br> LIBERTY MUTUAL INSURANCE COMPANY, <br><br>     Third-Party Plaintiff, <br><br> vs. <br><br> PELLA CORPORATION and PELLA WINDOWS AND DOORS OF ONTARIO CORP., <br><br>     Third-Party Defendants. | **No. 4:11-cv-00273 – JEG** <br><br> **O R D E R** |

This matter comes before the Court on cross-motions for partial summary judgment filed by Plaintiffs Pella Corporation, Pella Windows and Doors of Ontario Corporation, and Pella Windows and Doors, Inc. (collectively, Pella), ECF No. 169, and Defendant Liberty Mutual Insurance Company (Liberty Mutual), ECF No. 168. Both parties have filed responses and replies. A hearing on the Motions was held on August 31, 2016. Attorney Keith McKenna was present and argued on behalf of Pella, accompanied by attorneys Marc Ladd and Richard Lozier Jr. Attorney Jeff Gerish was present and argued on behalf of Liberty Mutual, accompanied by attorneys Charles Browning and Bob Waterman. The matter is fully submitted and ready for disposition.

## I.   BACKGROUND[1]

### A.  Overview

Pella, a manufacturer of windows and doors, initiated this insurance coverage action against Liberty Mutual, its insurer during the relevant period.  Liberty Mutual has asserted counterclaims against Pella.  In Pella's present motion for partial summary judgment, Pella seeks a declaration that Liberty Mutual must pay Pella's costs associated with certain underlying lawsuits against Pella.  Because there are many such underlying lawsuits against Pella, this litigation focuses on fifteen representative claims (the Sample Claims). The allegations of the Sample Claims differ somewhat, but they all generally allege that Pella's products were defectively designed, manufactured, or installed, and allowed water intrusion to buildings that resulted in third-party property damage or personal injury.

Liberty Mutual insured Pella during annual policy periods covering September 1, 2000 to September 1, 2008 under a series of insurance policies of two types: commercial general liability policies (CGL Policies), which insured Pella for reasonable attorneys' fees and other costs to defend against certain legal claims, subject to deductibles (termed "self-insured retentions" or "SIRs"); and "Aggregate SIR Policies," which capped, subject to deductibles (termed "Insured's Retentions"), the aggregate amount of SIR payments Pella might be required to pay under a given CGL Policy if numerous SIRs were required (referred to herein, collectively with the CGL Policies, as the Liberty Mutual Policies).  Coverage under the CGL Policies is triggered when Pella is found liable for "personal injury" or "property damage" caused by an "occurrence" during the policy period (as defined in the CGL Policies).  Pella App. 595, ECF No. 173-1. Liberty Mutual concedes that all the Sample Claims allege "personal injury" and/or "property damage" during the CGL Policy periods.  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id. at

---

[1] The facts here are either undisputed or, if genuinely disputed, viewed in the light most favorable to the nonmoving party.  See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

613.  The CGL Policies provide that the insurance "does not apply to . . . '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."  Id. at 596.  Coverage under the Aggregate SIR Policies can be triggered if there are several occurrences, requiring Pella to pay numerous SIRs.

Each of the CGL Policies includes a Supplementary Payments/Allocated Loss Adjustment Expense endorsement.  Id. at 594.  These endorsements provide that Liberty Mutual will reimburse Pella for "Allocated Loss Adjustment Expense" (ALAE) paid in excess of the SIR.  Id. at 594.  ALAE "includes but is not limited to . . .  reasonable attorneys' fees for claims in suit." Id. at 610.  The reasonable attorneys fees covered by both the CGL and Aggregate SIR Policies is defined to include fees incurred at "rates which are actually paid by [Liberty Mutual] to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended."  App. 610, 627.

### B.  Prior Coverage Action

Though not controlling here, the parties have already litigated before this Court whether Liberty Mutual owed Pella coverage under the CGL Policies for defense costs incurred in two underlying class action lawsuits.  Those lawsuits were: (1) Pappas v. Pella Corp., No. 02-L-14558 (Ill. Cir. Ct., Cook Cty.), and (2) Saltzman v. Pella Corp., Case No. 06-CV4481 (N.D. Ill.).  See Pella Corporation and Pella Windows and Doors, Inc.'s First Amended Counterclaims at 1-2, Liberty Mut. Ins. Co. v. Pella Corp., 4:07-cv-00508-JEG-TJS (S.D. Iowa May 5, 2008), ECF No. 41-1.  The Pappas and Saltzman lawsuits alleged that design defects in Pella's windows allowed water to enter the plaintiffs' homes, causing property damage or bodily injury.  The original and first amended complaints in Pappas alleged both strict liability and negligence, and Liberty Mutual, along with other carriers, agreed to participate in defending the Pappas suit.  Later, the Pappas complaint was amended to allege only a single claim for consumer fraud.  Liberty Mutual then filed an action in this Court (the Prior Coverage Action), alleging that each underlying lawsuit alleged that Pella knew its windows were defective and requesting a declaration that Liberty Mutual owed no duty to cover either the Pappas suit or the

Saltzman suit. Prior Coverage Action Complaint at 7, 15-16, Liberty Mut., No. 4:07-cv-00508-JEG-TJS (S.D. Iowa Nov. 6, 2007).  On appeal from this Court, the Eighth Circuit held that because the allegations in Pappas and Saltzman contained only allegations that Pella knew its windows were defective, neither complaint alleged an "accident" under Iowa law.  Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1176 (8th Cir. 2011)  Therefore, there could be no "occurrence," which precluded coverage under the CGL Policies.  Id.

### C.  The Sample Claims

Pella alleges that it has paid defense and indemnity costs on over 100 claims covered by Liberty Mutual CGL policies.  The Sample Claims at issue here include fifteen of the highest dollar-value claims (including defense and indemnity payments) that have been brought against Pella and for which Pella seeks coverage from Liberty Mutual.  The Sample Claims are:

1.  Pappas v. Pella Corp., No. 02-L-14558 (Ill. Cir. Ct., Cook Cty.) (the Pappas Claim or Pappas Lawsuit)

2.  464 Prospect – La Jolla Homeowners Ass 'n v. DTC-RECP OPCO, LLC, Case No. GIC842100 (Cal. Super. Ct., San Diego Cty.) (the 464 Prospect Claim);

3.  Diamantis v. Pella Corp., No. CV-08-900963-GWN (Ala. Cir. Ct., Madison Cty.) (the Diamantis Claim)

4.  Eakins v. Pella Corp., No. 05-5CVS-5CV 4696 (N.C. Super. Ct. Div., New Hanover Cty.) (the Eakins Claim); (7:05-CV-224-B)(2)

5.  G.T. Leach Constr., Inc. v. Pella Corp., No. 2009-11158 (Tex. Dist. Ct., Harris Cty., 334 Jud. Dist.) (the G.T. Leach Claim);

6.  Kaslly Family Revocable Tr. v. Distinctive Gen. Contracting Inc., No. A507598 (Nev. Dist. Ct., Clark Cty.) (the Kaslly Claim);

7.  Leal v. Am. Nat'l Lloyd's Ins. Co., No. CL-38, 608-A (Tex. Cty. Ct., Hidalgo Cty.) (the Leal Claim);

8.  London Bay Constr., Inc. v. Pella Windows & Doors of Fla., Inc., No. 06-1048-CA (Fla. Cir. Ct., Collier Cty.) (the London Bay Claim);

4

9.  <u>Marseilles Homeowners Condo. Ass 'n v. Broadmoor, LLC</u>, No. 2003-728 (La. Civ.
Dist. Ct., Parish of Orleans) (the <u>Marseilles</u> Claim);

10.  <u>Morse v. Sec. Equip., Inc.</u>, No. CI08-461 (Neb. Dist. Ct., Platte Cty.) (the <u>Morse</u>
Claim);

11.  <u>Newland Cmtys. Texas L.P. v. Flynn Constr., Inc.</u>, No. GN 401840 (Tex. Dist. Ct.,
Travis Cty.) (the <u>Newland</u> Claim);

12.  <u>Padovano v. Desai Chia, Inc.</u>, No. 10217/04 (N.Y. Sup. Ct., Richmond Cty.) (the
<u>Padovano</u> Claim);

13.  <u>Palmetto Elec. Coop., Inc. v. LS3P Assocs. Ltd.</u>, No. 07-CP-27-020 (S.C. Ct. of
Common Pleas, Jasper Cty.) (the <u>Palmetto</u> Claim);

14.  <u>Parkloft Condo. Owners Ass 'n v. Parkloft, LLC</u>, No. 880097 (Cal. Super. Ct., San
Diego Cty.) (the <u>Parkloft</u> Claim); and

15.  <u>South Beach Club Horizontal Prop. Regime v. Associated Constr. Consultants, Inc.</u>,
No. 2004-CP-07-1872 (S.C. Ct. Common Pleas, Beaufort Cty.) (the <u>South Beach</u> Claim).

As noted above, Liberty Mutual concedes that each of the Sample Claims alleges or
otherwise involves a claim for property damage or personal injury, as those terms are defined in
the CGL Policies, during one or more of the policy periods.  Pella App. 5055.  Liberty Mutual
also concedes that the <u>Padovano</u> and <u>Morse</u> Claims each allege an occurrence.  Liberty Mut.
Opp. Br. at 9 n. 5, ECF No. 180.

With respect to the <u>Pappas</u> Claim, only costs incurred in defending against the original and
first amended complaints that fell within Pella's SIR are at issue here.  Pella asserts its defense
costs paid toward the original and first amended complaints in <u>Pappas</u> exceeded $1 million,
citing an agreement among Pella and several of its insurers in which the insurers agreed to pay
Pella's costs defending the <u>Pappas</u> action as well as another action, referred to as the <u>Smith</u>
action.  However, the agreement itself does not allocate defense costs between the two actions.
App. to Liberty Mut.'s Br. in Supp. of Mot. for Partial Summary Judgment at 004-005, <u>Liberty</u>
<u>Mut.</u>, No. 4:07-cv-00508-JEG-TJS (S.D. Iowa Nov. 23, 2009)  Pella, therefore, has not provided

a figure that clearly represents its costs defending the <u>Pappas</u> action only.  The allegations of the other Sample Claims are summarized below.

In the <u>464 Prospect</u> Claim, the plaintiff asserted a claim for "negligence" against all defendants alleging that they "breached their duty of care in that they negligently, carelessly, defectively and wrongfully failed to use reasonable care in the design, development, manufacture, building, contracting, maintenance, construction, installation, and marketing of the Project, including the condominiums and common areas thereof." Pella App. 3454-55.  Pella incurred $82,330.09 in defense costs for the <u>464 Prospect</u> Claim.

In the <u>Diamantis</u> Claim, the plaintiffs alleged breach of contract, breach of implied warranty, and fraudulent concealment of alleged defects.  The <u>Diamantis</u> court granted Pella's motion for summary judgment on the fraud claims, leaving for trial only the claims based on Pella's unintentional sale of defective products.  Pella incurred $57,565.54 in defense costs for the <u>Diamantis</u> Claim.

In the <u>Eakins</u> Claim, the plaintiffs alleged that certain questions of law and fact common to the purported Class included "[w]hether [Pella], with respect to the Designer Series windows and glazing system, were negligent in:  (1) design; (2) formulation; (3) manufacture; (4) production; (5) quality control; (6) testing; (7) labeling; (8) warning; and/or (9) otherwise failing to use ordinary care" and "[w]hether [Pella] negligently, recklessly, and/or unfairly and deceptively concealed from consumers and suppliers the fact that the Designer Series glazing system and/or design was defective." Pella App. 3611-12.  Pella incurred $326,736.26 in defense costs for the <u>Eakins</u> Claim.

In the <u>G.T. Leach</u> Claim, the plaintiffs asserted a claim for "strict liability, product liability and negligence" against Pella, alleging that "negligence and defects in the design, marketing and manufacture of the windows and related materials was a producing cause of and/or the proximate cause of and resulted in damage" to the plaintiffs' property and that "the damages . . . were proximately caused by [Pella's] negligence in designing, manufacturing, and marketing the

windows and related materials." Pella App. 3633-34.  Pella incurred $265,196.10 in defense costs for the G.T. Leach Claim.

In the Kaslly Claim, the plaintiffs asserted a claim for "negligence and negligent workmanship" against all defendants, including Pella, alleging that "Defendant[s] failed and neglected to perform the work, labor or services properly or adequately in that the Defendants negligently, or purposely, and in an unworkmanlike manner, supervised and/or performed the work, labor and/or services such that the Subject Property was constructed improperly, negligently, carelessly and/or in an unworkmanlike manner. This negligence constitutes a breach of a duty owed to Plaintiff[s]," and that "[a]s a direct and proximate result of the Defendants' negligence, carelessness, purposeful and unworkmanlike conduct, Plaintiffs have suffered damages." Pella App. 910.  Pella incurred $128,841.09 in defense costs for the Kaslly Claim.

In the Leal Claim, the defendant/third-party plaintiff American National Lloyds Insurance Company asserted a claim for "negligence" against Pella and others, alleging that third-party defendants "through their negligent construction and workmanship, created defects in the [plaintiffs'] home and caused the dwelling to become to susceptible to and to endure water damage." Pella App. 3914.  Pella incurred $126,720.58 in defense costs for the Leal Claim for which Pella seeks reimbursement from Liberty Mutual.

In the London Bay Claim, a general contractor alleged that the Pella windows it purchased failed and leaked, which caused damage to walls, fixtures, furnishing, landscaping, and other property.  Pella App. 3977-3979.  A portion of the underlying complaint alleged intentional wrongdoing, and other portions did not.  Pella incurred $69,185.42 in defense costs for the London Bay Claim.

In the Marseilles Claim, the plaintiff alleged that water intrusion at a condominium was due to the "defective, deficient, and negligent design and manufacture of the Pella Products . . . [and] inferior materials used in the manufacture of the Pella Products by the Pella Defendants." Pella App. 3998. Additionally, the Marseilles plaintiff alleged that Pella's attempt to repair the leaking windows by wet-sealing them had failed, and that due to Pella's "negligent

misrepresentations regarding the quality, design, construction and suitability of the Pella

Products, as well as [Pella's] negligent misrepresentations regarding the repairs, remedies, and

corrections purportedly required . . . [plaintiff] experienced additional damages."  Pella App.

3999.  Pella asserts that it incurred $907,061.32 in defense costs for the <u>Marseilles</u> Claim.  Pella

asserts that $670,041.51 of these costs is reflected in invoices paid by a Liberty Mutual

intermediary, and that Pella paid $237,019.81 on its own.  Liberty Mutual disputes Pella's

assertion to the extent that it is overly broad, vague, misleading and/or unsupported by the

citation provided.  On review of the record, Pella's supporting materials indicate $670,041.51

was invoiced to a Liberty Mutual intermediary, and that Pella paid $237,473.60 on its own – a

higher amount than Pella's supporting affidavit states.[2]  (Pella App. 458 (Payment Report

provided by Liberty Mutual to Pella, showing $670,041.51 was paid by Liberty Mutual); Pella

App. 488-511, 513-526 (Pella's direct payment checks for defense of the <u>Marseilles</u> Claim);

Touchton Decl. ¶ 20 n.5, Pella App. 436 (see footnote below));   For purposes of this motion, the

Court does not view the discrepancy, $453.80, as material to the reasonableness of Pella's

defense costs.

In the <u>Morse</u> Claim, the plaintiffs asserted a claim for "negligence" against Pella, alleging

that "Pella's conduct in the design, planning, supervision and observation of construction and in

the construction and installation of the windows fell below the standard of care of a reasonable

window installer," and that "Pella's negligence was a proximate cause of water entering the

house and of Plaintiffs' damages."  Pella App. 4279.  Pella asserts that it incurred $71,730.60 in

---

[2] The calculation of the latter figure is muddled in the supporting documentation.  Pella states it received invoices that covered both the <u>Marseilles</u> Claim and a non-Sample Claim without distinguishing between the two claims.  Pella's supporting affidavit indicates in a footnote that it is not seeking reimbursement of costs associated with the non-Sample Claim, specifying the amounts to be deducted from each invoice.  As stated above, applying these deductions results in a figure that does not square with Pella's asserted total defense costs.

defense costs for the Morse Claim.  Pella asserts that $56,375.46 of these costs is reflected in invoices paid by a Liberty Mutual intermediary, and that Pella paid $15,355.14 on its own.[3]

In the Newland Claim, the plaintiffs asserted a claim for "negligence" against Pella and others, and alleged that "Pella was negligent in the performance of its work and services. This includes, without limitation, negligent design, manufacturing, repair, and/or marketing of its window products. All such negligence has damaged Plaintiffs and caused damage in and to the Clubhouse."  Pella App. 4384. Additionally, co-defendant Flynn Construction, Inc. asserted a cross-claim against Pella, and asserted an affirmative defense of contributory negligence, stating that "Plaintiffs' claims are barred to the extent that the Plaintiffs' alleged injuries and damages were caused, in whole or in part, by the contributory negligence of third parties beyond the control of Defendant FLYNN, including, but not limited to, Defendant PELLA."  Pella App. 4443.  Pella incurred $179,303.54 in defense costs for the Newland Claim.

The Padovano complaint asserted that the damages in that case were due to the "negligence, carelessness and recklessness" of Pella "by reason of [Pella's] failure to properly design, manufacture[], warn, inspect, service, distribute, assemble, market, sell, maintain, and control the . . . double hung window." Pella App. 4523.  Pella incurred $227,425 in defense costs for the Padovano Claim.

In the Palmetto Claim, third-party plaintiff Gulf Stream Construction Co., Inc. asserted a claim for "negligence" against Pella, alleging that "Pella was negligent in the manufacturing of the window units installed in the Plaintiffs' property by failing to provide windows that were watertight and constructed of materials that would resist rot and deterioration and by failing to provide a defect-free product that met all applicable code requirements and construction industry standards. The negligence of Pella proximately caused damage from water intrusion." Pella App. 4555-56.  Pella incurred $114,325.42 in defense costs for the Palmetto Claim.

---

[3] Liberty Mutual disputes Pella's assertion to the extent that it is overly broad, vague, misleading and/or unsupported by the citation provided.  On review of the record, the Court finds the materials cited by Pella support both figures.

In the <u>Parkloft</u> Claim, the plaintiffs asserted a claim for "negligence" against "all defendants and Does 4 through 600," alleging that they "breached their duty of care in that the negligently, carelessly, defectively and wrongfully failed to use reasonable care in the design, development, construction consulting, testing, inspection, construction management and administration, installation of materials, construction, manufacture, maintenance, defect remediation, marketing and sales to the public of the condominiums and common areas of the Parkloft Project." Pella App. 4781-82. The plaintiffs amended their complaint to add Pella to the Parkloft Claim as "DOE 203." Pella App. 1501-02.  To date, Pella has incurred $515,699.82 in defense costs for the <u>Parkloft</u> Claim.

In the <u>South Beach</u> Claim, the plaintiffs asserted a claim for "negligence/gross negligence" against Pella, alleging that "Pella negligently, or with gross negligence, designed and/or negligently manufactured and marketed the windows which were installed at the Project," including allegations that "the product's design is defective in that it fails to provide a sufficient barrier against the inevitable intrusion of water into the system" and that Pella's products "were defectively designed and manufactured in that it is impossible to keep a building free from water exposure." Pella App. 4802.  Pella incurred $113,299.98 in defense costs for the <u>South Beach</u> Claim.

### D.  Reasonableness of Defense Costs

The parties dispute whether Pella is entitled to summary judgment as to the reasonableness of the attorneys' fees incurred as defense costs.  In its February 13, 2012 response to Pella's First Set of Interrogatories, Liberty Mutual stated, among other things, that it did "not have sufficient information" to provide its position on the reasonableness of Pella's defense costs, and that such information was "premature given that discovery ha[d] just begun."  Pella App. 5094-95. Liberty Mutual's January 24, 2013 supplemental response to Pella's Second Set of Interrogatories did not state a position on the reasonableness of any of Pella's defense costs for the Sample Claims, stating that it was "premature given that no depositions have been taken" and because Liberty Mutual did not have "access to all of the invoices" of Pella's defense counsel.

Pella App. 5055-57.  Liberty Mutual did not further supplement its response to Pella's interrogatories before the close of discovery eight months later, by which point Liberty Mutual had copies of the defense invoices and had taken depositions.

During the Prior Coverage Action, Liberty Mutual contended that, in order for Pella to ascertain Liberty Mutual's position on the reasonableness of defense costs at issue there, Pella should have taken a Rule 30(b)(6) deposition of Liberty Mutual regarding the rates Liberty Mutual ordinarily pays.  When Pella sought to take a Rule 30(b)(6) deposition in this case on the issue of the reasonableness of Pella's defense costs in the Sample Claims, Liberty Mutual's corporate representative testified that she had not reviewed the defense invoices for the Sample Claims and was unprepared to testify as to their reasonableness.  Liberty Mutual's position in this litigation is that Pella has not met its burden to establish the reasonableness of its defense costs.

When Liberty Mutual administratively processed Pella's contemporaneous reporting on its defense costs, Liberty Mutual retained the right to challenge costs and rates that it felt were not reasonable, and Liberty Mutual occasionally reduced payments that it made toward law firms' invoices that charged rates in excess of those rates Liberty Mutual had pre-approved or in excess of what Liberty Mutual had paid the same law firm for other similar claims against Pella.[4]  At deposition, a Liberty Mutual claims handler indicated it was part of his practice as a claims handler to review proposed litigation expenses to determine whether they were reasonable and necessary for the relevant defense strategy.[5]

## II.   DISCUSSION

---

[4]  Liberty Mutual disputes Pella's assertion to the extent that it is overly broad, vague, misleading and/or incorrect based upon the testimony at issue. The testimony aligns with Pella's assertion.

[5] Liberty Mutual denies this assertion to the extent that it is overly broad, vague, evasive, misleading and or incorrect based upon the testimony at issue.  The testimony aligns with Pella's assertion.

The Court shall grant summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Celotex, 477 U.S. at 324). A genuine issue for trial requires more than "some metaphysical doubt as to the material facts." Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Liberty Mutual, in its motion, seeks a judgment that under Iowa law, defective workmanship manifesting in water intrusion is not an "occurrence" as defined in the CGL Policies. Pella, in its motion, requests a judgment that each of the Sample Claims alleged potentially covered claims under one or more of Liberty Mutual's insurance policies during the relevant period, and thus fell within the scope of Liberty Mutual's obligation to cover Pella's costs defending those claims. Pella further requests a judgment that its costs in defending the Sample Claims were reasonable and are payable by Liberty Mutual, including the defense costs Pella incurred defending the original and first amended complaints in the Pappas action.

**A. When Defective Workmanship Claims May Allege an "Occurrence"**

**1. Principles Governing Interpretation of the Policies**

It is undisputed that Iowa law governs this action. "In interpreting state law, [federal courts] are bound by the decisions of the state's highest court." Allstate Indem. Co. v. Rice, 755 F.3d 621, 623 (8th Cir. 2014) (citation omitted). Decisions of the Iowa Court of Appeals are persuasive authority when they are the best evidence of Iowa law. See id. Iowa's "rules governing the construction and interpretation of insurance policies are well-settled." Amish Connection, Inc. v. State Farm Fire & Cas. Co., 861 N.W.2d 230, 236 (Iowa 2015). The cardinal

rule is that the "intent of the parties at the time the policy was sold must control." Id. (quoting

Lemars Mut. Ins. Co. v. Joffer, 574 N.W.2d 303, 307 (Iowa 1998)).

Iowa courts distinguish between interpretation and construction of insurance policies.

Boelman v. Grinnell Mut. Reinsurance Co., 826 N.W.2d 494, 501 (Iowa 2013).  Interpretation

involves giving meaning to the words of the policy.  "Policy interpretation is always an issue for

the court, unless [the court is] required to rely upon extrinsic evidence or choose between

reasonable inferences from extrinsic evidence." Id.  Iowa courts give undefined words in an

insurance policy their ordinary meaning.  "The plain meaning of the insurance contract generally

prevails." Id.  Iowa courts will not interpret an insurance policy to render any part superfluous,

unless doing so is reasonable and necessary to preserve the structure and format of the provision.

Id. at 502.

Construction of an insurance policy involves giving legal effect to the contract, which is

always a matter of law for the court. Id. at 501. Courts are to determine the intent of the parties

by "looking at what the policy itself says." Id.  "When read as a whole, a policy is ambiguous if

the language is "susceptible to two reasonable interpretations." Id.  However, a policy is not

ambiguous simply because the parities disagree on its meaning or it could have been worded

more precisely.  Amish Connection, Inc., 861 N.W.2d at 236.  "If the policy is ambiguous, [Iowa

courts] adopt the construction most favorable to the insured," because insurance policies are

adhesion contracts. Boelman, 826 N.W.2d at 502.

### 2.  The Nature of the Dispute

In the Prior Coverage Action, the Eighth Circuit held that the complaints in two underlying

lawsuits at issue, Pappas and Saltzman, did not contain allegations that were arguably or

potentially covered by the CGL Policies because neither alleged property damage caused by an

"occurrence." Liberty Mut., 650 F.3d at 1176.  Because the definition of "occurrence" in the

CGL Policies includes the requirement that the occurrence be an "accident," the Eighth Circuit

considered the meaning of "accident" under Iowa law.  In part, the Iowa Supreme Court has

defined "accident" as "an undesigned, sudden, and unexpected event." Id. at 1175 (quoting

Pursell Constr. Inc. v. Hawkeye-Sec. Ins. Co., 596 N.W.2d 67, 70 (Iowa 1999)).  The Circuit

noted that both the Pappas and Saltzman claims alleged that Pella knew its windows were defective.  Id. at 1176.  The court then held "[u]nder Iowa law, such defective workmanship, as alleged in the Pappas and Saltzman Suits, cannot be considered an occurrence."  Id. Accordingly, Liberty Mutual did not have to reimburse Pella for its costs to defend the Pappas and Saltzman complaints at issue, and the Policies did not cover Pella's losses at issue in that case.  Id.  Liberty Mutual seeks a broad application of that prior decision of the Court of Appeals finding continued applicability in what is now before this Court; but this Court must view that prior Liberty Mutual case as confined to the specific allegations.

In the present action, Pella asserts that unlike Pappas and Saltzman, the Sample Claims arguably allege property damage arising from "occurrences" because they allege Pella acted unintentionally and negligently rather than knowingly or intentionally.  Pella asserts that most of the Sample Claims explicitly allege that Pella was negligent in the design, manufacture, marketing, sale repair, or installation of its windows or doors.  Pella argues that the two Sample Claims that do not specifically contain negligence allegations nonetheless allege that Pella's unintentional conduct caused personal injury or property damage.  Pella contends that the facts alleged, not the labels of the causes of action, control whether Liberty Mutual has a duty to reimburse Pella's defense costs.  In addition, Pella argues it is entitled to recover the sums it spent defending against the original and first amended complaint in the Pappas class action, because those complaints did not allege that Pella intentionally engaged in any wrongful conduct.

Pella contends that Iowa law is like the law of most jurisdictions[6] in recognizing that defective workmanship resulting in third party property damage can give rise to an occurrence under a CGL policy.  On the other hand, it is clear under Iowa Supreme Court precedent that defective workmanship that does *not* result in third party property damage cannot support the finding of an occurrence.  As the Iowa Supreme Court recognized in Pursell Construction Inc. v. Hawkeye-Security Insurance Co., 596 N.W.2d 67, 70 (Iowa 1999), "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."  In that case, the plaintiff, Pursell, was hired to construct basements for two houses.  Pursell unintentionally built the basements below a floodplain, in violation of a city ordinance.  To fix the problem, Pursell needed to redo the construction, and Pursell sought insurance proceeds to cover costs.  Because the alleged damage was only to the property on which Pursell had performed work, the Iowa Supreme Court held Pursell could not recover under the insurance policy.  Id. at 68-71.

Following Pursell, in General Casualty Insurance Cos. v. Exterior Sheet Metal, Inc., No. C01-2085, 2002 WL 32172280, at *6 (N.D. Iowa Dec. 24, 2002), the district court for the Northern District of Iowa predicted that the Iowa Supreme Court, if presented with the issue, would conclude that "negligence that causes damage to property other than the insured's own work product constitutes an 'accident'" under modern CGL policies.  In that case, an underlying

---

[6] See, e.g., Edward E. Gillen Co. v. Ins. Co. of Pa., 874 F. Supp. 2d 755, 758 (E.D. Wis. 2012) ("[W]hile faulty workmanship is not an 'occurrence,' faulty workmanship may cause an 'occurrence.'"); Fejes v. Alaska Ins. Co., 984 P.2d 519, 524 (Alaska 1999); U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So.2d 871, 891 (Fla. 2007); Sheehan Constr. Co. v. Cont'l Cas. Co., 935 N.E.2d 160, 169-71 (Ind. 2010); Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co., 137 P.3d 486, 495 (Kan. 2006); Wanzek Constr., Inc. v. Emp'rs Ins. of Wausau, 679 N.W.2d 322, 324-27 (Minn. 2004); JTO, Inc. v. State Auto. Mut. Ins. Co., 956 N.E.2d 328, 331-32 (Ohio Ct. App. 2011) (complaint alleging faulty workmanship resulted in unexpected water damage to walls and ceilings alleged an "occurrence"); Corner Constr. Co. v. U.S. Fid. & Guar. Co., 638 N.W.2d 887, 894-95 (S.D. 2002); Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 308-309 (Tenn. 2007); Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 20 (Tex. 2007); Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 78 (Wis. 2004).

lawsuit alleged a policyholder's faulty construction of a sheet-metal roof caused leaking that damaged both the roof itself and other property in the building.  Id. at *2-3.  The district court held that while the damage to the roof itself was not covered, consequential damage to other property was covered.  Id. at *6-7.  Pella also cites National Surety Corp. v. Dustex Corp., No. C13-02004, 291 F.R.D. 321, 325, 329 (N.D. Iowa 2013), in which the district court for the Northern District of Iowa denied an insurer's motion for summary judgment against coverage for damage resulting from the insured's defective work, reasoning that yet-incomplete discovery could reveal third party property damage, which might rebut the insurer's argument for summary judgment.

Interpreting Pursell figures centrally into each party's argument.  Pella contends that Pursell held only that damage to the insured's product itself is not an occurrence. See Pursell, 596 N.W.2d at 70.  Pella argues that Pursell does not stand for the broader proposition that the insured's unintentionally defective workmanship cannot give rise to an occurrence no matter what property is damaged.  Pella emphasizes the statement in Pursell that "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."  Id. at 71.  Pella contends that W.C. Stewart Construction Inc. v. Cincinnati Insurance Co., No. 08-0824, 2009 WL 928871 (Iowa Ct. App. Apr. 8, 2009) and Dustex, 291 F.R.D. 321, both recognize that damage to property other than the insured's own work product could potentially be caused by an occurrence under a CGL policy.

In resistance to Pella's motion and in support of its own motion, Liberty Mutual argues that the Eighth Circuit's holding in the Prior Coverage Action, as well as Pursell and W.C. Stewart, compel the conclusion that Pella's defective workmanship, and property damage that is its natural or foreseeable consequence, cannot give rise to an occurrence.  Liberty Mutual's argument relies on two bases.  First, Liberty Mutual argues that defective workmanship cannot constitute an "occurrence" because it cannot be properly understood as a fortuitous "accident."  Second, Liberty Mutual contends that defective workmanship in general is simply not properly within the scope of a CGL insurance policy, pointing to Pursell for the proposition that

"defective workmanship, in and of itself, is not an occurrence and thus there is no coverage for the defective workmanship that gave rise to the Sample Claims."  Liberty Mut. Opp. Br. at 9, ECF No. 180.  Liberty Mutual only seeks summary judgment with regard to thirteen of the fifteen sample claims because it concedes that the <u>Padovano</u> and <u>Morse</u> claims arguably allege an "accident."

Liberty Mutual emphasizes the definition of "accident" frequently cited in Iowa and cited in <u>Pursell</u>, which is:

> an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force. . . . [G]iving to the word the meaning which a man of average understanding would, we think ["accident"] clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune.

596 N.W.2d at 70 (alterations in original) (quoting <u>Central Bearings Co. v. Wolverine Insurance Co.</u>, 179 N.W.2d 443, 448 (Iowa 1970)).  The <u>Pursell</u> court reasoned that "fortuity implied by reference to accident or exposure is not what is commonly meant by a failure of workmanship." <u>Id.</u>

Liberty Mutual recognizes that the <u>Pursell</u> court later stated in that opinion that "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."  <u>Id.</u> at 71.  This holding leaves open the possibility that the foreseeable consequences of such defective workmanship, including damage to property other than an insured's work product, could constitute an accident.  However, Liberty Mutual contends that, read as a whole, <u>Pursell</u> stands for the broader proposition that situations involving defective workmanship simply cannot involve an "accident," and therefore defective workmanship cannot give rise to an occurrence.  Liberty Mutual supports this argument by citing <u>W.C. Stewart</u>, an Iowa Court of Appeals case, which held that damage to the property on which defective work was performed cannot constitute an occurrence, even where the property damage extends beyond the damage to the defective work itself.  <u>W.C. Stewart</u>, 2009 WL 928871 at *3-4.  Liberty Mutual argues that to hold otherwise would improperly render CGL policies

17

performance bonds.  Finally, Liberty Mutual criticizes General Casualty, which held that "consequential damages" resulting from faulty workmanship could constitute an "occurrence." Gen. Cas. Ins. Co., 2002 WL 32172280, at *7.  Liberty Mutual argues General Casualty improperly collapsed the independent requirements of "property damage" and an "occurrence" by finding that the occurrence *was* the property damage.  Liberty Mutual contends to the contrary that property damage must be *caused by* an occurrence and therefore that the concepts of occurrence and property damage are analytically distinct.

While Liberty Mutual acknowledges that most jurisdictions do not hold defective workmanship claims to be incompatible with the existence of an occurrence, it contends Pennsylvania and Illinois agree with Iowa that defective workmanship is not in itself an occurrence.  Liberty Mutual cites at some length Millers Capital Ins. Co. v. Gambone Bros. Development Co., 941 A.2d 706 (Pa. Super. Ct. 2007), in which an insured conceded that faulty workmanship was not itself an occurrence, but contended that water damage caused by defective workmanship was an occurrence.  Id. at 713.  The court disagreed, reasoning that "natural and foreseeable acts, such as rainfall," which exacerbate the consequences of faulty workmanship, are not sufficiently fortuitous to be considered an accident, and therefore that there was no occurrence caused by the faulty workmanship.  Id.  The court continued that the tort-law concept of proximate cause supported the court's rationale because under tort law an event does not constitute a superseding cause unless it was not reasonably foreseeable.  Id. at 713-14.  Liberty Mutual also cites Specialty Surfaces International, Inc. v. Continental Casualty Co., 609 F.3d 223 (3d Cir. 2010), which relied on several Pennsylvania cases and held that faulty workmanship and natural and foreseeable events are not occurrences.  Id. at 238-39.

Pella contends Liberty Mutual's argument that foreseeable consequences of defective workmanship cannot constitute an occurrence would essentially make the policies a nullity. Pella argues that if the damage resulting from its products is not foreseeable then Pella is likely not liable on the underlying claims, because negligence is predicated on reasonable foreseeability.  Pella reasons that on such a theory, its ultimate exposure would then only be

covered under the insurance contract if its exposure was limited under the law.   However, in the event damage is foreseeable under Liberty Mutual's proposed approach, Pella would find itself lacking coverage for more meritorious claims, where its potential liability would be much greater.  Pella cites <u>City of Carter Lake v. Aetna Casualty and Surety Co.</u>, 604 F.2d 1052 (8th Cir. 1979), which applied Iowa law and rejected cases that held foreseeable consequences of negligent conduct cannot be an "accident" within the meaning of an insurance policy, noting:

> To adopt [the insurer's] interpretation that an injury is not caused by accident because the injury is reasonably foreseeable would mean that only in a rare instance would the comprehensive general liability policy be of any benefit to Carter Lake. Enforcement of the policy in this manner would afford such minimal coverage as to be patently disproportionate to the premiums paid and would be inconsistent with the reasonable expectations of an insured purchasing the policy. . . . Under [the insurer's] construction of the policy language if the damage was foreseeable then the insured is liable, but there is no coverage, and if the damage is not foreseeable, there is coverage, but the insured is not liable. This is not the law.

<u>Id.</u> at 1058 (citation omitted).  Pella contends the relevant inquiry is whether Pella actually and subjectively expected its products to damage other property, not whether it was foreseeable that defective windows would leak.

Pella also supports its motion for summary judgment by focusing on the language of the CGL Policies.  Pella argues that the CGL Policies at issue contemplate coverage for defective products and workmanship.  Pella contends that several recent decisions from other jurisdictions have held that CGL policies even cover damage to the insured's own product.  Pella asserts that because the CGL policies partially exclude coverage for damage to "your work" and "your product," the policies therefore implicitly contemplate some coverage for defective workmanship.  Pella argues that there would be no need for the "your work" and "your property" exclusions if defective workmanship could never be an occurrence in the first place.  An Iowa district court agreed with this reasoning in <u>National Surety Corp. v. Westlake Investments, LLC</u>, No. CL 123479, slip op. at 15-17 (Iowa Dist. Ct., Polk Cnty. Aug. 27, 2013) (Hanson, J.).

Pella contends that the policy language, and interpretations of similar language outside Iowa, compels the conclusion that poor workmanship resulting in third party property damage

can be an occurrence.  See, e.g., Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co., 746 S.E.2d 587, 593 (Ga. 2013) (noting the "strong recent trend in the case law [that] interprets the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship") (quoting Greystone Constr. Inc. v. Nat. Fire & Marine Ins. Co., 661 F.3d 1272, 1282 (10th Cir. 2011)).

Specifically, Pella focuses on the exclusions in Section 2 of the CGL Policies, which bar coverage for some cases of defective products and defective workmanship.  Many of these exclusions refer to damage caused by, or inflicted to, the insured's work product.  For instance, Exclusion (j)(6) excludes from coverage property damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it," unless such property damage is included in the "products-completed operations hazard."  Pella App. 598.  The products-completed operation hazard (PCOH) generally restores coverage for property damage otherwise excluded under (j)(6) if the damage occurs away from the insured's premises and arises from the insured's work or product.  Id.; Pella App. 614. Separately, Exclusion (k) excludes from coverage "'[p]roperty damage' to 'your product' arising out of it or any part of it."  Pella App. 598.  Exclusion (l) excludes from coverage "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard,'" but states that "[t]his exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  Pella App. 598.  Pella contends that these exclusions would be superfluous if defective workmanship could never be an occurrence in the first place.  See U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 887 (Fla. 2007) ("[A] construction of the insuring agreement that precludes recovery for damage caused to the completed project by the subcontractor's defective work renders the 'products-completed operations hazard' exception to exclusion (j)(6) and the subcontractor exception to exclusion (l) meaningless."); Taylor Morrison, 746 S.E.2d at 592 n.12 ("As several courts have observed, these exclusions would be rendered largely superfluous by an overly narrow definition of 'occurrence.'"); Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 673

(Tex. App. 2006) ("[F]inding no occurrence for defective construction resulting in damage to the insured's work would render the subcontractor exception superfluous and meaningless."). Pella cites National Union Fire Insurance Co. of Pittsburgh, Pa. v. Terra Industries, Inc., 216 F. Supp. 2d 899, 919 (N.D. Iowa 2002), aff'd 346 F.3d 1160, for the proposition that the purpose of CGL policies with completed operations coverage is to insure against "the possibility that [the insured's] products, once completed and sold, would cause bodily injury or damage to property other than the product itself, and for which [the insured] might be found liable." Id. at 919.

Liberty Mutual disputes whether the CGL Policy exclusions support Pella's interpretation of "occurrence." Liberty Mutual contends that Pella's discussion of the PCOH exception to the exclusion is misplaced because even claims that fall within the PCOH exception still must meet the other requirements of the Policies. For this proposition, Liberty Mutual cites the following passage from Pursell:

> The PCOH provision is simply a category of losses that are covered even though these losses might otherwise be excluded. Viewed in this light, the PCOH provision does not create a separate category of coverage. Rather, any loss falling within the PCOH provision must still meet all the requirements of the policy, like any other loss, except the exclusion from which the losses are excepted.

596 N.W.2d at 69.

Liberty Mutual disputes Pella's contention that if defective workmanship could never be an "occurrence," there would be no need for the exception for subcontractors in section 2(l). Liberty Mutual argues that defective workmanship can *cause* an occurrence, such as when poor workmanship leads to a sudden event like a roof collapse (which Liberty Mutual contends would be an occurrence), but that defective workmanship is not *itself* an occurrence. Accordingly, in Liberty Mutual's view, the 2(l) exception allows coverage for calamitous damage to Pella's work that arises out of that work, if included in PCOH and a subcontractor performed the work on Pella's behalf. Liberty Mutual thus concedes that because a dramatic "accident" occurred "on the heels of an act of defective workmanship," the policies do cover the Morse and Padovano claims. Pella argues that Liberty Mutual's position would lead to arbitrary results. Pella

contends this ceiling collapse alleged in the <u>Morse</u> claim is equally as foreseeable as the damage alleged in the other underlying suits.

### 3.  Whether an Insured's Negligence Can Give Rise to an Occurrence

As the above discussion makes clear, the central issue of the parties' motions is whether, under Iowa law, the damage alleged in the Sample Claims was caused by an "occurrence," meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Pella App. 566, ECF No. 173-1.  Because the Sample Claims generally allege property damage resulting from Pella's negligent design or installation of its products, the motions focus on whether such defective design or workmanship can be deemed an accident.  However, Liberty Mutual also raises two other questions: whether defective design or workmanship, even if not an accident itself, can ever give rise to an accident; and whether claims of negligence, which inherently allege that the damage in question was foreseeable, can support the finding of an accident.

Defective design or workmanship itself is not an event that qualifies as an "accident" as used in the CGL policies, and as defined under Iowa law.  The term "accident" "clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune."  <u>Pursell</u>, 596 N.W.2d at 70 (quoting <u>Cent. Bearings Co.</u>, 179 N.W.2d at 448).  In other words, where claims are predicated on liability for defective design or workmanship, such defective design or workmanship is alleged to be the tortious or negligent conduct giving rise to liability, which is distinct from any accident that may or may not be caused by such conduct.

Conversely, it is not the case – and <u>Pursell</u> did not hold – that defective design or workmanship cannot give rise to an accident.  <u>See</u> <u>Norwalk Ready Mixed Concrete, Inc. v. Travelers Ins. Co.</u>, 246 F.3d 1132, 1134 (8th Cir. 2001) ("Without qualm, the <u>Pursell</u> court explained that negligent conduct itself, although it may ultimately result in injury or damage to a victim, does not fall within the ordinary meaning of an accident.  That is not to say that

negligence cannot be the cause of an accident.") (internal punctuation marks omitted).[7]  Rather, the holding in Pursell concerned the scope of coverage for property damage caused by an occurrence in the context of misfortune resulting from faulty workmanship: "[D]efective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."  596 N.W.2d at 71.  The Pursell court grounded its reasoning in "the fundamental nature of a comprehensive general liability policy of the type involved in this litigation."  Id.  Allowing coverage for damages arising from defective workmanship based on damages to the work product itself would amount to a guarantee of coverage for defective workmanship.  This would obliterate the distinction between negligence, which is not an accident, and the resulting misfortune.  See id. (observing that "to conclude that the mere showing of faulty work is sufficient to bring a claim for resulting damages (of whatever nature) within policy coverage" would "ignore the policy requirement that the occurrence be an accident").

Later cases applying Iowa law have assumed the validity of the inverse of Pursell's holding: that if defective workmanship causes damage to property *other* than the defective work itself, there can be an occurrence.  Norwalk, 246 F.3d at 1137 (holding no coverage extended to the cost of repairing and replacing defective concrete made by the insured); Gen. Cas. Ins. Co., 2002 WL 32172280, at *7 (holding coverage existed over claims that the insured's defective

---

[7] Indeed, the quoted definition of accident in Pursell originated from an earlier Iowa case, Central Bearings Co., 179 N.W.2d at 448, which in turn quoted the Arizona case Century Mutual Insurance Co. v. Southern Arizona Aviation, Inc., 446 P.2d 490 (Az. Ct. App. 1968).  In Southern Arizona Aviation, the insured sought reimbursement for its defense costs in defending a suit that alleged the insureds negligently serviced and inspected a propeller that malfunctioned and caused an airplane accident.  446 P.2d at 491.  The insurance policy was in effect at the time of the service and inspection, but not at the time of the plane accident.  Id.  The court held that the alleged negligent service and inspection was not an "accident" that occurred during the term of the insurance policy.  Rather the "accident" was the airplane accident that caused the property damage for which the insureds sought coverage.  Id. at 492.  It was in this context that the court announced the language later incorporated into the Iowa cases, that the term "accident" "clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune."  Id. (citations omitted).

installation of a roof damaged property within the structure, though not over damage to the roof itself); see also Cont'l W. Ins. Co. v. Oaks Dev. Co., 2010 WL 2087935 at *4 (Iowa Ct. App. May 26, 2010) (Mansfield, J.) (holding that Pursell controlled because the only damage at issue was to the property allegedly defectively installed). These authorities implicitly recognize that defective workmanship may cause an occurrence in certain situations, though the defective workmanship itself does not constitute the occurrence.

However, Iowa cases since Pursell have not been completely uniform in their interpretation of the case.  In W.C. Stewart, Stewart was a subcontractor hired to perform grading services at a building site.  2009 WL 928871 at *1.  The developer refused to pay Stewart because the grading services caused building movement and cracks in the walls.  Id. Stewart sued for the balance of the contract price and the developer counterclaimed for the costs of repairing Stewart's work and for repairing the building.  Id.  The insurer refused to defend Stewart against the counterclaim.  Id.  Stewart argued that Pursell did not control because developer alleged that Stewart's work damaged property other than Stewart's work product.  Id. at *3.  The Court of Appeals asserted that "Stewart reads Pursell too narrowly."  Id.  The court noted that the party damaged by the defective work in Pursell had to reinstall plumbing and ductwork which the contractor who performed the defective work did not install.  Id.  The Court of Appeals went on to emphasize Pursell's conclusion that the damages the underlying plaintiff in Pursell sought were "limited to the very property upon which Pursell performed work."  Id. (quoting Pursell, 596 N.W.2d at 71-72).  The Court of Appeals then held that the insurer properly denied coverage because the damage Stewart allegedly caused was limited to the property on which Stewart performed work.  Id. at *4.

On the other hand, the bulk of Iowa state court decisions have held that an insured's defective workmanship that causes damage to property other than the work itself can give rise to an occurrence.  See, e.g., Sickler v. Auto Owners Ins. Co., No. 14-1636, 2015 WL 4935710, at *3 (Iowa Ct. App. Aug. 19, 2015) ("Pursell does not address . . . faulty workmanship [that] causes property damage to something other than the insured's work product"); Cincinnati Ins.

Co. v. Concept Builders, Ltd., No. LACV024669, slip op at 5 (Iowa Dist. Ct. Cass Cnty. Jan. 27, 2016) (damages to cattle, gates, rails, and stalls from collapse of insured's defective roof work was caused by an occurrence under Iowa law).

A recent decision of the Iowa Supreme Court has indirectly addressed the ambiguity left by Pursell and resolved it in favor of a narrow reading of Pursell's holding.  In National Surety Corp. v. Westlake Investments, LLC, 880 N.W.2d 724 (Iowa June 10, 2016), the Iowa Supreme Court clarified:

> Our holding in Pursell was limited by its plain language to situations in which the insured performed defective work and sought coverage for the cost of repairing the defective work product.  By implication, Pursell anticipated that a CGL policy might provide coverage for at least some claims arising from defective construction, just not claims seeking coverage for repairing or replacing the insured's own defective work product.

Id. at 738 (citations omitted).  Therefore, Westlake indicates that Pursell limits coverage in the narrow circumstance where the only damage is to the insured's work product itself.  Westlake confirms that the inverse of Pursell also holds under Iowa law, and that CGL policies can cover claims arising from defective workmanship that causes damage to property other than the insured's work product.

A recent decision of the Iowa Court of Appeals notes that in this regard, "Westlake was a bit of a game changer," and extends the holding of Westlake beyond the context in which an insured seeks coverage related to damages caused by the insured's subcontractor.  Hudson Hardware Plumbing & Heating, Inc. v. AMCO Ins. Co., No. 15-1677, 2016 WL 5930779, at *6 (Iowa Ct. App. Oct. 12, 2016).  In Hudson Hardware, the insured sought coverage under a CGL policy for a lawsuit in which it was alleged that the insured had negligently installed a heating, ventilation, and air conditioning system, which resulted in mold, excess humidity, and excess odor in the plaintiff's building.  The insurer denied coverage, stating that the damages being claimed did not amount to an occurrence or property damage under the policy.  Reversing the entry of summary judgment in favor of the insurer, the Iowa Court of Appeals reasoned that

since the underlying complaint could have alleged unexpected damage that went beyond the insured's work product, the complaint could have alleged an occurrence that required coverage under the CGL policy.  Id. at *7.

A recent Eighth Circuit case also confirms a narrow interpretation of Pursell and makes clear that the meaning of "occurrence" covers damages to property other than the insured's work product.  Decker Plastics Inc. v. W. Bend Mut. Ins. Co.,833 F.3d 986, 988 (8th Cir. Aug. 19, 2016).  In that case, Decker Plastics, a manufacturer of plastic bags, sold its product to A1, a vendor of landscaping materials.  Id. at 987.  Because Decker Plastics failed to manufacture the bags with an ultraviolet inhibitor, the bags deteriorated in the sunlight, causing small shreds of plastic to mix with A1's landscaping materials.  Id.  A1 sued Decker Plastics to recover its losses, and Decker Plastics's insurer denied coverage.  Id.  Reversing the district court's ruling, the Eighth Circuit determined that the deterioration of Decker Plastics' bags was a covered occurrence, and predicted that the Supreme Court of Iowa would follow the reasoning of similar cases to limit the holding of Pursell to cases where the alleged occurrence is defective workmanship causing damage only to the work product itself.  Id. at 988.  The Court finds the facts of Decker Plastics to be substantially analogous to the facts of this case, and its reasoning is sound.  Decker Plastics and the Iowa case law on which it is based command the conclusion that defective workmanship resulting in third party property damage can give rise to an occurrence under Iowa law.[8]

Moreover, Decker Plastics clarifies how an "accident" may arise in the context of a claim based on defective workmanship.  Decker Plastics acknowledges that the defective workmanship itself is not an accident according to Iowa law.  Id. at 987.  Rather, the accident in Decker Plastics was the deterioration of the bags that was made possible due to defective workmanship. The deterioration, not the defective workmanship that caused it, was an unintended misfortune

---

[8] Whether or not this Court is compelled to follow the holding in Decker Plastics, as suggested at oral argument, the Court independently reached the same conclusion based upon its review of Iowa law.

26

that resulted ultimately in damage to the claimant's property (including property other than the bags themselves).  Id. at 988.  Similarly, here, the Sample Claims generally allege that water leaked through windows because of defective workmanship, causing various damage and injuries.  Decker Plastics suggests that the accident in such a case would be the leaking of the windows – not the defective workmanship itself.  The question remains whether such an event indeed qualifies as an accident.

Liberty Mutual argues that Pella's defective workmanship at issue in the Sample Claims cannot be an accident because the natural, expected consequences of faulty workmanship are not sufficiently fortuitous to be considered accidental.  Liberty Mutual's argument suggests that claims based on negligence, which necessarily require that the injury be the foreseeable consequence (even if unintended) of the alleged tortious conduct as opposed to a separate intervening cause, do not give rise to an occurrence.  To the extent that defective workmanship can give rise to an occurrence, under this approach, it can only be the case where the damage-causing event is *not* foreseeable.  This is what Liberty Mutual says distinguishes the Padovano and Morse claims from the remaining Sample Claims.  Only events that are not "the natural, expected consequence of a leaking window," such as personal injuries sustained by a fall, or the collapse of an entire ceiling, qualify as accidents under this approach.  Liberty Mut. Br. in Supp. of MSJ 21 n.13, ECF No. 168-1.  Liberty also argues that the inclusion of the term "sudden" in the standard Iowa definition of accident, see, e.g., Pursell, 596 N.W.2d at 70, supports this view; gradual property damage due to water leakage is not "sudden" and thus would not be an accident.

But the term "accident," as used in this context, encompasses more than what might be best understood as freak accidents.  This should be clear from the definition of "occurrence," which specifically *includes* "continuous or repeated exposure to substantially the same general harmful conditions."  Pella App. 566.  Nor is the standard Iowa definition of an "accident" incompatible with negligence.  Norwalk, 246 F.3d at 1137 (citing Pursell, 179 N.W.2d at 70).  Decker Plastics reaffirms the conclusion that an insured's negligence can give rise to an

occurrence, even if the negligence itself cannot: "To rephrase <u>Pursell</u>'s definition of 'accident,' the occurrence was 'a misfortune with concomitant damage to a victim [A1's], and not the negligence [of Decker Plastics] which eventually result[ed] in that misfortune.' The covered property damage (if any) was to A1's property other than the bags." <u>Decker Plastics</u>, 833 F.3d at 988. None of these cases suggested, as Liberty Mutual does, that only an unnatural, abrupt, and dramatic event can constitute an "accident." Indeed, <u>Decker Plastics</u> bars such an interpretation, since the gradual degradation of plastic bags in the sun cannot sensibly be viewed as a sudden event.  That event would also appear to be the natural and consequential result of poor workmanship in manufacturing, as alleged in the underlying lawsuit.

Iowa precedent also makes clear that the term "accident" in CGL policies merely forecloses coverage for events the insured actually intended or expected.  In <u>United Fire & Casualty Co. v. Shelly Funeral Home, Inc.</u>, 642 N.W.2d 648, 652 (Iowa 2002), the Iowa Supreme Court considered a CGL policy with the same definition of "occurrence" and "accident" at issue here.  The court observed that "[a]n exclusion . . . precludes coverage for bodily injury 'expected or intended from the standpoint of the insured.'  The language of this exclusion incorporates the common definition of 'accident.'" <u>Id.</u>  The court further explained that the common definition of accident refers to "an unexpected and unintended event." <u>Id.</u> (quoting <u>Weber v. IMT Ins. Co.</u>, 462 N.W.2d 283, 287 (Iowa 1990)); <u>see also</u> <u>Interstate Power Co. v. Ins. Co. of N. Am.</u>, 603 N.W.2d 751, 754 (Iowa 1999) (holding environmental contamination is not "accidental" within the meaning of the policy at issue "when the sources of the contamination are manufacturing waste [that were] allowed to accumulate on or in the earth over a period of several decades"); <u>Dico, Inc. v. Emp'rs Ins. of Wausau</u>, 581 N.W.2d 607, 613 (Iowa 1998) (defining "accident" in the context of a coverage dispute regarding environmental contamination as "an unexpected or unintended event").  This, of course, is consistent with the Eighth Circuit's holding in the Prior Coverage Action. <u>Liberty Mut.</u>, 650 F.3d at 1176.

<u>Westlake</u> further illustrates that accidents may be foreseeable as long as the accident is in fact unintended.  "[A]n intentional act resulting in unexpected and unintended property damage

qualifies as an accident that amounts to an occurrence covered by a CGL policy so long as the insured did not expect and intend both the act itself and the resulting harm."  Westlake, 880 N.W.2d at 736 (citing West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc., 503 N.W.2d 596, 600-01 (Iowa 1993)).  "Considered from the standpoint of the insured, 'a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly.'"  Id. (citing Lamar Homes, 242 S.W.3d at 8).[9]  The Westlake court further emphasized that the very purpose of CGL policies is to provide coverage for alleged damage arising from defective workmanship. Id. at 741-42 (noting that revisions made to the standard-form CGL policy in 1986 "were intended to extend CGL coverage under standard-form policies to property damage arising from defective construction").

For all these reasons, the Court concludes that under Iowa law, claims of defective workmanship manifesting in water intrusion that damages property other than the work itself include the allegations of an accident – namely, unexpected and unintended water intrusion – and thus can support the finding of an "occurrence."  This may be the case even where the claims are based in negligence and the property damage is alleged to have been foreseeable.  Therefore, Liberty Mutual's motion for summary judgment, ECF No. 168, must be denied.

**B. Coverage of the Sample Claims**

As the Eighth Circuit stated in the Prior Coverage Action, "[t]he Iowa Supreme Court has explained that 'the duty to defend rests solely on whether the petition contains any allegations that arguably or potentially bring the action within the policy coverage.'"  Liberty Mut., 650 F.3d at 1170 (quoting Emp'rs Mut., 552 N.W.2d at 641).  If there is any "doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the

---

[9] The exception to this rule is that an event will not be considered an accident if it 'was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not.'"  Id. (quoting Lamar Homes, 242 S.W.3d at 9).  This exception goes beyond mere foreseeability.

insured." Emp'rs Mut., 552 N.W.2d at 641 (quoting A.Y. McDonald Indus., Inc. v. Ins. Co. of

N. Am., 475 N.W.2d 607, 627 (Iowa 1991) (en banc).  As this Court has said:

> [I]t is the allegations of fact in the underlying complaint, not the legal labels under
> which a plaintiff decides to seek relief, that determine the scope of the duty to defend.
> See Employers Mut., 552 N.W.2d at 642 (noting that "it is clear under Iowa law that an
> insurance company is to look at the allegations of fact in the third-party plaintiff's
> petition against the insured and not the legal theories on which the third-party
> claims the insured is liable.").

Liberty Mut. Ins. Co. v. Pella Corp., 633 F. Supp. 2d 714, 721 (S.D. Iowa 2009).

Liberty Mutual has conceded that each of the Sample Claims alleges or otherwise involves

a claim for property damage or personal injury, as those terms are defined in the CGL Policies,

during one or more of the policy periods.  Pella App. 5055.  Liberty Mutual also concedes that

the Padovano and Morse claims allege an occurrence.  The only remaining hurdle to find

coverage is whether the remaining Sample Claims potentially or arguably allege occurrences.

Liberty Mutual only specifically disputes the sufficiency of the allegations in two of the

Sample Claims, London Bay and Diamantis.  Liberty Mutual argues that these claims do not

involve negligence allegations, and that the London Bay claim alleges intentional torts.  As to

the former argument, a claim of negligence is not required to establish a covered occurrence;

rather, as stated above, the key question is whether the claim "contains any allegations that

arguably or potentially bring the action within the policy coverage." Liberty Mut., 650 F.3d at

1170 (quoting Emp'rs Mut. Cas. Co., 552 N.W.2d at 641).  The underlying policies do not

condition coverage on a finding of negligence.  Instead, they merely require that property

damage be caused by an occurrence.

The Diamantis plaintiffs alleged that windows and doors they received from Pella failed

and allowed water intrusion, and brought claims for (1) breach of contract, (2) breach of implied

warranty for supplying the defective products, and (3) fraudulent concealment of alleged defects.

Those claims rest on the allegations that Pella's windows failed and leaked, damaging the

surrounding areas of the plaintiffs' home.  The plaintiffs demanded compensatory relief at least

in part directed at remediating property damage to their home.  Liberty Mutual concedes that the

claims for breach of contract and breach of warranty do not, as written, allege intentional conduct on Pella's part.  The fraud claim was dismissed before trial. Given Iowa law, the underlying factual allegations – *i.e.*, that Pella manufactured and sold defective windows that allowed water intrusion – coupled with the specific request for damages to repair and remediate damage to the structure of the plaintiffs' homes as a result of water intrusion is sufficient to "arguably or potentially bring the action within the policy coverage."  <u>A.Y. McDonald</u>, 475 N.W.2d 607, 627 (Iowa 1991) (internal citation omitted).

In the <u>London Bay</u> claim, a general contractor alleged that the Pella windows it purchased failed and leaked, which caused damage to walls, fixtures, furnishing, landscaping, and other property.  These factual allegations did not include an allegation that Pella acted knowingly or intentionally.   However, Liberty Mutual points out that several of the legal claims for relief allege that Pella "knew or should have known" that its windows were defective.  <u>See</u> Pella App. 3980, 3982.   Liberty Mutual thus disputes that the <u>London Bay</u> claims do not involve intentional conduct.

Yet alleging that a party "knew or should have known" of some fact is consistent with claims for unintentional or negligent conduct, and indeed is often used to establish a duty that a defendant breached by its negligence.  <u>See, e.g.</u>, <u>Brooks v. Dickey</u>, 158 N.W.2d 11, 13 (Iowa 1968) ("[N]oncompliance with custom is some proof of lack of due care on the issue of negligence if it is shown the party charged knew or should have known of such custom"); <u>Hanson v. Town & Country Shopping Ctr., Inc.</u>, 144 N.W.2d 870, 873 (Iowa 1966) (holding that "[t]o sustain a charge of negligence the unsafe condition relied on must be one of which the owner knew or should have known"); <u>Phillips v. Foster</u>, 109 N.W.2d 604, 605 (Iowa 1961) (driver "was negligent in failing to have his car under control when he knew, or should have known, the icy condition of the surface of the highway").  Indeed, Count I of the <u>London Bay</u> complaint otherwise mirrors the elements of a negligence claim.  It sets forth allegations regarding Pella's alleged duty, its alleged breach of that duty, and the damages allegedly directly and proximately caused by the breaches.  Pella App. 3980.  Thus, it is arguable or plausible that

31

the London Bay claim alleges damages resulting from an occurrence, *i.e.*, Pella's negligent or defective workmanship giving rise to water intrusion.[10]

Though Liberty Mutual does not analyze coverage of the Pappas claim in particular, Pappas merits separate discussion since it was the subject of the Prior Coverage Action.  The Eighth Circuit's decision regarding Liberty Mutual's obligations as to the Pappas fourth amended complaint is not necessarily dispositive of Liberty Mutual's obligations with respect to the  Pappas litigation prior to that amendment, because Liberty Mutual's duty to reimburse Pella's defense costs is both contemporaneous and determined by the allegations in the operative complaint.  Liberty Mut., 650 F.3d at 1172.  The original and first amended class action complaints in Pappas alleged that Pella's negligent design or manufacture of its windows caused third party property damage.  For the time those complaints were operative, they arguably or potentially were within the scope of the CGL Policies and alleged an occurrence.  Therefore, Liberty Mutual owed a contemporaneous duty to reimburse Pella's costs before the complaint was amended to remove allegations not relating to the final intentional tort claim.

All of the additional claims allege damage to property beyond the allegedly faulty windows themselves.  Further, they each arguably or potentially provide allegations of unintentional conduct causing the damage.

The 464 Prospect Claim potentially alleged an occurrence in that it alleged property damage because Pella "negligently, carelessly, defectively and wrongfully failed to use

---

[10] The Eighth Circuit's opinion in the Prior Coverage Action notes that Liberty Mutual characterized the Pappas and Saltzman claims at issue in that case as involving allegations that Pella "knew or, *at a minimum, should have known* that there was a substantial probability that damage would result from its actions."  Liberty Mut., 650 F.3d at 1174.  However, the opinion in the Prior Coverage Action is clear that both underlying claims were grounded entirely in allegations that Pella actually knew its windows were defective when sold.  Id. at 1165, 1176. Moreover, the language "knew or, at a minimum, should have known" did not actually appear in the underlying claims at issue in the Prior Coverage Action.  Brief of Appellant/Cross-Appellee at *54, Liberty Mut. Ins Co. v. Pella Corp, 2010 WL 3163321 (8th Cir. July 28, 2010) (Nos. 10-1933, 10-2065).

reasonable care in the design, development, manufacture, building, contracting, maintenance, construction, installation, and marketing" of its products.  Pella SUF ¶ 42, ECF No. 169-2.

The <u>Eakins</u> Claim potentially alleged an occurrence in that it posed "[w]hether [Pella], with respect to the Designer Series windows and glazing system, were negligent in: (1) design; (2) formulation; (3) manufacture; (4) production; (5) quality control; (6) testing; (7) labeling; (8) warning; and/or (9) otherwise failing to use ordinary care" and "[w]hether [Pella] negligently, recklessly, and/or unfairly and deceptively concealed from consumers and suppliers the fact that the Designer Series glazing system and/or design was defective."  Pella SUF ¶ 43.

The <u>G.T. Leach</u> Claim potentially alleged an occurrence by alleging "negligence and defects in the design, marketing and manufacture of the windows and related materials was a producing cause of and/or the proximate cause of and resulted in damage . . . ." and that "the damages . . . were proximately caused by [Pella's] negligence in designing, manufacturing, and marketing the windows and related materials."  Pella SUF ¶ 44.

The <u>Kaslly</u> Claim potentially alleged an occurrence by alleging "Defendant[s] failed and neglected to perform the work, labor or services properly or adequately in that the Defendants negligently, or purposely, and in an unworkmanlike manner, supervised and/or performed the work, labor and/or services" and that as a result of "Defendants' negligence, carelessness, purposeful and unworkmanlike conduct, Plaintiffs have suffered damages."  Pella SUF ¶ 45.

The <u>Leal</u> Claim potentially alleged an occurrence because it alleged Pella, "through their negligent construction and workmanship, created defects in the [plaintiffs'] home and caused the dwelling to become to susceptible to and to endure water damage . . . ." Pella SUF ¶ 46.

The <u>Marseilles</u> Claim potentially alleged an occurrence by alleging water intrusion due to "defective, deficient, and negligent design and manufacture of the Pella Products . . . [and] inferior materials used in the manufacture of the Pella Products by the Pella Defendants," as well as damages due to Pella's "negligent misrepresentations regarding the quality, design, construction and suitability of the Pella Products, as well as [Pella's] negligent

misrepresentations regarding the repairs, remedies, and corrections purportedly required." Pella SUF ¶ 47.

The <u>Newland</u> Claim potentially alleged an occurrence, i.e., "negligent design, manufacturing, repair, and/or marketing of its window products" that caused third party property damage. Pella SUF ¶ 49.

The <u>Palmetto</u> Claim potentially alleged an occurrence because it alleged "[t]he negligence of Pella proximately caused damage from water intrusion." Pella SUF ¶ 50.

The <u>Parkloft</u> Claim potentially alleged an occurrence by alleging Pella "negligently, carelessly, defectively and wrongfully failed to use reasonable care in the design, development, construction consulting, testing, inspection, construction management and administration, installation of materials, construction, manufacture, maintenance, defect remediation, marketing and sales to the public" of its products. Pella SUF ¶ 51.

The <u>South Beach</u> Claim potentially alleged an occurrence in that it alleged "Pella negligently, or with gross negligence, designed and/or negligently manufactured and marketed the windows which were installed at the Project," which made it "impossible to keep a building free from water exposure." Pella SUF ¶ 52.

In light of the foregoing, Pella's motion for partial summary judgment as to coverage of the Sample Claims, ECF No. 169, must be granted.

**C. Reasonableness of Pella's Defense Costs**

"Summary judgment is appropriate if the record, viewed in a light most favorable to the non-moving party, contains no questions of material fact and demonstrates that the moving party is entitled to judgment as a matter of law." <u>McBurney v. Stew Hansen's Dodge City, Inc.</u>, 398 F.3d 998, 1001 (8th Cir. 2005). Once the moving party has met its burden of showing an absence of a genuine dispute of material fact and an entitlement to judgment as a matter of law, the non-moving party cannot rest on its allegations but must set forth "specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>Id.</u> (citing <u>Kincaid v. City of Omaha</u>, 378 F.3d 799, 803-04 (8th Cir. 2004)). "[S]ummary judgment will not lie if the

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249.   A movant's prima facie showing that it is entitled to summary judgment "shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a genuine issue for trial or to submit an affidavit requesting additional time for discovery." Celotex, 477 U.S. at 331.  "As is clear by Rule 56(c)'s express requirement that the nonmoving party must support its factual positions, the nonmovant cannot satisfy that burden by relying on mere allegations in the pleadings to show that there is a triable issue." 10A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 2727.2 (4th ed.); see also Lundeen v. Cordner, 354 F.2d 401, 407 (8th Cir. 1966) ("Intervener having made a sufficient showing, it then rests upon the plaintiff to specify at least some evidence which could be produced at trial.")

Pella argues that summary judgment should be granted in its favor on the issue of whether the attorneys fees it paid in defense of the Sample Claims were reasonable. It argues that Liberty Mutual has failed to provide a basis for disputing the reasonableness of Pella's defense costs, from the time that it began contemporaneously processing such claims, as invoiced by Pella, to the present.

The CGL Policies define "reasonable attorneys' fees" as "rates which are actually paid by us to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended." Pella App. 610.  Pella argues that undisputed evidence in the record supports the conclusion that its costs were reasonable.  While Liberty Mutual denies or objects to most of the salient facts on this issue in Pella's statement of undisputed facts, the record does reveal Liberty Mutual monitoring of these expenses.  The appendix indicates Liberty Mutual referred the Morse claim to a law firm called Woods &

Aitken LLP at a stipulated billing rate and instructed the firm to invoice Liberty Mutual directly. The record also shows Liberty Mutual refused to pay an invoice for that firm over the stipulated rate. Liberty Mutual also wrote off a substantial percentage of an invoice it received from a firm handling the G.T. Leach, Leal, and Newland claims. Deposition testimony from Liberty Mutual claim handlers shows Liberty Mutual occasionally reduced the rate at which it paid outside law firms if the rates were inconsistent with what the firm billed in other matters.

Even with the foregoing involvement, Liberty Mutual offers no factual basis to challenge Pella's argument that its costs were reasonable. Indeed, Liberty Mutual has never answered or supplemented its answers to Pella's interrogatories on this issue, arguing it is premature to determine reasonableness. Rather, Liberty Mutual merely offers citations for the proposition that "[r]easonablness, of course, is a fact question" typically reserved for the fact-finder. E.g., Pirelli-Armstrong Tire Co. v. Reynolds, 562 N.W.2d 433, 436 (Iowa 1997). Liberty Mutual begs the question, however, because there is no factual issue for the fact finder to resolve unless there is evidence to support a verdict for the nonmoving party. Liberty Lobby, 477 U.S. at 249 (1986). Because Pella has produced evidence supporting its motion that its defense costs were reasonable, and because Liberty Mutual has failed to produce any evidentiary basis upon which it would dispute the reasonableness of Pella's defense costs, there is no genuine issue for trial, except with respect to the defense costs incurred with respect to the Pappas lawsuit which cannot be isolated in this record. Pella's motion as to the reasonableness of its costs must therefore be granted, except with respect to Pappas, for which the Court lacks an adequate record.

## III.  CONCLUSION

Based on the foregoing, Liberty Mutual's Motion for Partial Summary Judgment, ECF No. 168, must be **denied**, and Pella's Motion for Partial Summary Judgment, ECF No. 169, must be **denied in part and granted in part;** denied for the reasons stated, with respect to the reasonableness of defense costs incurred in the Pappas lawsuit, and granted with respect to the remainder. Each Sample Claim, including the Pappas Claim before the second amended

complaint was filed, alleged claims potentially covered under one or more Liberty Mutual Policy covering the periods from September 1, 2000 to September 1, 2008, and thus falls within the scope of Liberty Mutual's defense coverage obligations under those policies.

**IT IS SO ORDERED.**

Dated this 1st day of November, 2016.

JAMES E. GRITZNER, Senior Judge
U.S. DISTRICT COURT